UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
-------------------------------------
UNITED STATES OF AMERICA

                 -vs-                                12-CR-84

HAROLD HOWARD,

                      Defendant.
-------------------------------------


        Proceedings held before the

    Honorable Jeremiah J. McCarthy,

    U.S. Courthouse, 2 Niagara Square,

    Buffalo, New York on February 15, 2012.


    APPEARANCES:

    MELISSA M. MARANGOLA,
    Assistant United States Attorney,
    Appearing for the United States.

    ANTHONY L. PENDERGRASS, ESQ.,
    Appearing for Defendant.


    AUDIO RECORDER:  M. Linda Lewis


    TRANSCRIBER:       Michelle L. McLaughlin, RPR,
                       Official Reporter,
                       U.S.D.C. W.D.N.Y.
                       (716)332-3560



    (Proceedings recorded by electronic sound
    recording, transcript produced by computer.)

2

1                           I N D E X

2              WITNESS                              PAGE

3         DANIEL GRANVILLE
   Direct Examination by Mr. Pendergrass         13
4  Cross-Examination by Ms. Marangola            24
   Redirect Examination by Mr. Pendergrass       32
5  Recross-Examination by Ms. Marangola          39

6         HAROLD HOWARD
   Direct Examination by Mr. Pendergrass         40
7  Cross-Examination by Ms. Marangola            61

8

9         DEFENDANT'S EXHIBITS                    EVD.

10            A, B, and D                         60

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          THE CLERK:  On the record, United States

2     versus Harold Howard.  For the government, Melissa

3     Marangola.  For the defendant Anthony Pendergrass.

4     The defendant is present, and the Court is assisted

5     by United States Probation Officer Assistant Curtis

6     Middlebrooks.

7       We are here for a continuation of the detention

8     hearing from February the 7th this year.  The

9     Honorable Jeremiah McCarthy presiding.

10          THE COURT:  Good morning, Mr. Howard.

11     Good morning, counsel, and Mr. Middlebrooks.

12          MR. PENDERGRASS:  Good morning, your

13     Honor.

14          MS. MARANGOLA:  Good morning, your Honor.

15          THE COURT:  Are we ready to proceed?

16          MS. MARANGOLA:  Yes, your Honor.  Since

17     our last appearance though I do have additional

18     information that would go to the government's

19     proffer in this case.  I've looked into some of the

20     arguments that defense counsel made, and I can

21     provide a little clarity to the Court.

22       If the Court can recall, at our last appearance

23     defense counsel stated there were two firearms that

24     were charged in the state case, and there are three

25     alleged in the complaint presently before the

1    Court.  The Court showed concern over that issue.

2        I spoke to law enforcement involved in this

3    case, and the reason for that is the third firearm

4    that was located in the defendant's Hummer is a

5    machine gun, your Honor.  It was wrapped in

6    plastic, and the only reason it wasn't charged

7    originally is because that firearm was going to the

8    laboratory to be submitted for DNA testing.  They

9    could not unwrap it and identify it thoroughly

10    enough to charge it in a complaint without

11    contaminating the evidence.  So there's no question

12    as to how many firearms were located in the

13    vehicle.

14        In addition, your Honor, I know the defendant

15    was claiming he has little ties to the residence

16    that was searched in this case as well as the

17    Hummer that was searched in this case.  Again, I

18    spoke to deputies involved in the search warrant.

19    I do have a deputy in the court today who is

20    prepared to testify.

21        Prior to calling him, your Honor, I will tell

22    the Court that earlier of the very day the Hummer

23    was searched, deputies saw the defendant sitting in

24    the driveway for hours on end in a rental car

25    merely feet from the Hummer.  When they executed

1    the search warrant, there were several dogs at the

2    premises, and they ultimately had to shoot and kill

3    one of the dogs for safety purposes.  That dog

4    belongs to the defendant.

5        The defendant also claimed to the Court that

6    that house was rented to random people, and gave

7    the impression to the Court that an unrelated

8    family was living in that home and/or the items may

9    have belonged to this random family who was living

10   there.  The person who was staying in the home that

11   belonged to the defendant's fiance is Myron

12   Johnson's mother, who is the defendant's narcotics

13   co-defendant in the state court case.  Okay.

14       So this isn't -- the statements that were made

15   by the defendant at the last appearance may be a

16   little misleading to the Court, and I wanted to

17   clarify those.

18       In addition, I did discuss the fact that the

19   defendant was out on bail when he picked up these

20   charges.  I spoke to the DA in that case, and I

21   didn't provide the Court with all of the details

22   that I think the Court would like to consider at

23   this point.

24       First and foremost, he has a trial date set on

25   May 7th for that case.  And the case involves the

1    defendant driving in his vehicle, being pulled over

2    by the police, and having a loaded firearm in the

3    console of his vehicle.  His DNA is on that gun,

4    and the results are in the billions.  It is a very,

5    very strong case against the defendant in that

6    case.

7              THE COURT:  When you say "the results are

8    in the billions", what do you mean by that?

9              MS. MARANGOLA:  He cannot be excluded.

10   And to find another random sample of DNA would be

11   one in over a billion, your Honor.  I believe it

12   was quadra.  I don't want to overstate it to the

13   Court.  It's a very strong DNA results.

14       I have had the opportunity to listen to the

15   defendant's jail calls before coming to court

16   today.  And he speaks with his fiance about asking

17   a co-defendant to take the fall for him on the

18   firearm and sign a sworn affidavit.  He's

19   essentially -- and Judge DiTullio in state court,

20   as well as the DA's office have become aware of

21   this fact as well.  He's attempting to essentially

22   make a payment to another individual by the name of

23   Rabbit to take the fall for him.

24       This is an individual who knows the system,

25   your Honor, is very calculated in the way he

1    operates, and there are additional phone calls

2    related to the Hummer that he claims he has no ties

3    to, as well as the dog that was shot on the

4    property that day that were made by the defendant

5    to his fiance.

6         In light of that, your Honor, I can call a

7    witness.  Again, he's in the courtroom now.  But my

8    concern is that this is simply a fishing expedition

9    for the defendant to find the identity or

10   information leading to any confidential informants

11   who have been assisting law enforcement in this

12   case.  So I'm asking for the Court to prohibit any

13   testimony or any questioning by the defendant of

14   the identity of the CI or any multiple CIs in this

15   case or any information that would lead to their

16   identity.

17            THE COURT:  Okay.

18            MR. PENDERGRASS:  Your Honor, I think

19   this -- this hearing is for the limited purpose of

20   determining my client's contact with 93 Elmer

21   Avenue.  So certainly this is not the opportunity

22   for us to inquire about any confidential informant.

23   That opportunity will come later on in this

24   criminal matter when we have -- we ask for

25   discovery.  However, I feel compelled, your Honor,

1    to address some of the concerns your Honor raised

2    by the assistant U.S. attorney, which I think is,

3    you know, really no more than a red herring here in

4    a way to try to avoid the conduct of this hearing.

5        The simple fact of the matter is, your Honor,

6    as we have discussed prior, my client does not live

7    at 93 Elmer, never has lived at 93 Elmer, that the

8    93 Elmer was rented as of November 11, 2011.  Those

9    are simple -- those are the simple facts of the

10   matter.  We intend to prove that prior to the 93

11   Elmer being rented that there were construction

12   being done at 93 Elmer and my client -- so

13   certainly my client -- the only attachment my

14   client -- as I've represented to the Court

15   previously, only attachment my client had with 93

16   Elmer is to ensure -- is to sort of act in a

17   managerial position for his fiance who owned the

18   property there.  And that's the only attachment.

19       Moreover, my client -- again, as I represented

20   to the -- to the Court was arrested in 2009, and he

21   is going to trial soon on that charge, which I

22   think that, you know, the presumption of innocence

23   even attached to that -- to that charge as well.

24       But what's important in this matter, your

25   Honor, is that from 2009, when my client was

1    subjected to those charges, until November 16th

2    of 2011, my client engaged that process and

3    reported to court.  Given that he was facing the

4    same time in 2009 as he is facing here in 2011

5    relative to those charges, my client came to court

6    on each and every occasion that he was ordered to

7    be in court, and he engaged that process.  My

8    client wasn't rearrested until he was arrested on

9    these charges, and these charges are what we are

10   here for to determine whether or not my client

11   should be detained on.

12        So all of that other stuff about -- you know,

13   clearly is relevant to the -- to the question that

14   your Honor has to focus on, but, you know, it's --

15   you know, it's really a red herring to try to

16   influence the Court before evidence can be taken.

17   We are here prepared to -- to take evidence and to

18   give evidence in this matter, your Honor.  And so

19   if the U.S. attorney is ready to go forward, I'm

20   ready to go forward.

21        THE COURT:  Well, as I indicated last

22   week, my principle concern -- and I grant you that

23   it is rare to have live testimony at a detention

24   hearing, but it's not unheard of.  I've done it

25   before when I thought it was warranted, and I'm

1    prepared to do so now if it is warranted.

2        The reason I wanted testimony is that last

3    week, Mr. Pendergrass, you represented that the

4    defendant had very little contact with 93 Elmer and

5    did not live there and had not even though I

6    believe -- correct me if I'm wrong -- even though

7    the vehicle was registered to him, the Hummer, that

8    he had not used that vehicle in several months, is

9    that correct?

10        MR. PENDERGRASS:  That's correct, your

11    Honor.

12        THE COURT:  All right.  So, I mean, given

13    that the basis for the complaint in this case is

14    primarily the results of the search both of 93

15    Elmer and of the Hummer, I think it's appropriate

16    to explore whether the defendant -- whether what

17    was found at 93 Elmer and in the Hummer is likely

18    connected with the defendant or possibly connected

19    with somebody else.  And I don't know that I can do

20    that without hearing some testimony.

21        I don't see at this point any basis, and

22    Mr. Pendergrass has indicated that he does not

23    intend to be asking for identities of confidential

24    informants and so forth, so we won't get into that.

25    But I do want to hear a little more about this

1   search and who was there and who wasn't there, et

2   cetera.

3            MS. MARANGOLA:  I believe the defendant

4   said he was going to call witnesses.  I have a

5   rebuttal witness, as it's the government's

6   position, as I stated before, the presumption is in

7   my favor.  And I've proffered a case that I believe

8   is sufficient at this time.

9            THE COURT:  Well, that's --

10           MS. MARANGOLA:  The defendant indicated he

11  would like to call witnesses to rebut that, so I'd

12  ask if he's prepared to go forward, to call those

13  witnesses.  And I'd ask if the Court wants Deputy

14  Granville to excuse himself from the room so he

15  doesn't listen, if you would like him sequestered,

16  I'll ask him to leave the room.  All the other

17  witnesses testified.

18           THE COURT:  All right.  Mr. Pendergrass.

19           MR. PENDERGRASS:  I'm going to call Deputy

20  Granville.  He's in the courtroom.

21           THE COURT:  All right.  I'm going to allow

22  that.

23           MS. MARANGOLA:  Is that the sole witness?

24  You're not calling any other witnesses?

25           MR. PENDERGRASS:  No.  I'm going to

1    call -- I'm going to call another witness.  But I'm

2    going to call Deputy Granville, if he's in the

3    courtroom.

4              THE COURT:  All right.  Deputy Granville,

5    would you step forward, please?

6              MR. PENDERGRASS:  Your Honor, I would only

7    ask that I be granted some latitude for my

8    examination of (indiscernible).

9              THE COURT:  Well, we'll --

10             MS. MARANGOLA:  I don't believe he's

11   established Deputy Granville as a hostile witness,

12   so I don't believe it's acceptable at this point,

13   your Honor, or appropriate.

14             MR. PENDERGRASS:  Well, your Honor --

15             THE COURT:  We'll cross that bridge when

16   we get to it, okay, and we'll see how the

17   questioning goes.  You can swear the witness,

18   please.

19   D A N I E L   G R A N V I L L E, having been duly

20   sworn as a witness, testified as follows:

21             THE CLERK:  Please state your name for the

22   record, spelling first and last.

23             THE WITNESS:  Daniel Granville.

24   D-A-N-I-E-L.  Last name is G-R-A-N-V-I-L-L-E.

25             THE COURT:  You may proceed.

1              MR. PENDERGRASS:  Do you mind if I move,

2      your Honor?

3              THE CLERK:  Oh, yes, the podium please.

4              THE COURT:  Yes, just as long as --

5              THE CLERK:  We have to stay within the

6      cone, counselors.  In the cone in the microphone.

7              THE COURT:  Linda, where exactly is the

8      cone again?

9              MS. MARANGOLA:  Your Honor, I would ask if

10     there is any defense witnesses in the courtroom,

11     that they be asked to leave at this time.

12             THE COURT:  Well, other than the

13     defendant.

14             MS. MARANGOLA:  Obviously.

15             THE COURT:  Right.

16             MR. PENDERGRASS:  None.

17             THE COURT:  There are none.

18             MR. PENDERGRASS:  None that I intend to

19     call, your Honor.

20             THE COURT:  All right.

21     DIRECT EXAMINATION BY MR. PENDERGRASS:

22     Q.  Good morning, Deputy Granville.

23     A.  Good morning.

24     Q.  How are you?

25     A.  Good.  How are you?

1    Q.   Excellent.  I want to call your -- can you tell

2    me what police force do you work with?

3    A.   I'm a detective with the Erie County Sheriff's

4    Office.

5    Q.   Okay.  And were you acting in capacity of a

6    sheriff with the Erie County Sheriff's Office on

7    November 16th, 2011?

8    A.   Yes, sir.

9    Q.   And did you have an opportunity to arrest

10   Harold Howard on November 16th, 2011?

11   A.   Yes.

12   Q.   Okay.  And can you tell the Court, where was

13   Mr. Howard arrested?

14   A.   Would have been at I believe 43 Ruspin in the

15   city of Buffalo.

16   Q.   And now -- do you recall approximately what

17   time Mr. Howard was arrested at 43 Ruspin?

18   A.   I recall it was nighttime.  I don't recall the

19   exact time.

20            THE CLERK:  I didn't get that.

21            THE WITNESS:  I recall it was nighttime.

22            THE CLERK:  Nighttime.

23            MR. PENDERGRASS:  Do you recall what time

24   Mr. Howard was detained at 43 Ruspin?

25            MS. MARANGOLA:  I'm going to object, your

1    Honor, to relevance.  This has nothing to do with

2    his ties to this Hummer.  It's beyond the scope of

3    the limited purpose of this hearing, what the

4    defendant proffered was his purpose for this

5    testimony.

6            MR. PENDERGRASS:  Well, your Honor, I'm

7    just attempting to show that my client was a --

8    what time he was arrested and where he was arrested

9    and how long he was detained before he was

10   arrested.

11           MS. MARANGOLA:  Why is that relevant for

12   detention purposes?

13           MR. PENDERGRASS:  Well, it is relevant to

14   the question of his relationship to 93 Elmer and

15   how the detective then determined --

16           THE COURT:  Well, at this point, I don't

17   know whether or not it will be relevant.  It may

18   be.  I'm going to allow some latitude in this line

19   of questioning subject to tying in.

20   BY MR. PENDERGRASS:

21   Q.  Now -- so my client, Mr. Howard, was arrested

22   at 43 Ruspin, correct?

23   A.  That's correct.

24   Q.  Now prior to being arrested, he was detained at

25   43 Ruspin, correct?

1    A.   That's correct.

2    Q.   I mean, he was detained there for a number of

3    hours, correct?

4              MS. MARANGOLA:   Again objection.

5              THE COURT:   Overruled.

6              THE WITNESS:   I don't recall the amount of

7    time.   It was in excess of an hour, but I don't

8    recall exactly how many hours.

9    BY MR. PENDERGRASS:

10    Q.   Okay.   So he was detained at 43 Ruspin in

11    excess of an hour for the purpose of you acquiring

12    a search warrant?

13    A.   That's correct.

14    Q.   Okay.   Now -- now, you said you had a -- I

15    believe the assistant U.S. attorney said that you

16    had 93 Elmer under surveillance?

17    A.   That's correct.

18    Q.   Okay.   And can you tell the Court how long 93

19    Elmer was under surveillance?

20    A.   Are you referring to the day in question?

21    Q.   Well, leading up to the day in question.

22    A.   93 Elmer Street was reported to us over a year

23    prior to Mr. Howard's arrest as a residence that

24    Mr. Howard utilizes.

25    Q.   Now -- now, I understand that you said it was

1    reported to you over a year prior to his arrest.

2    My question -- my question goes specifically to the

3    surveillance of 93 Elmer.  How long did you have 93

4    Elmer under surveillance?

5    A.   Again, are you referring to the day in question

6    or the --

7    Q.   Leading up to the day in question, how long was

8    it under surveillance?

9    A.   Over a year.

10   Q.   Over a year.  And what kind of surveillance was

11   there?

12   A.   It would have been numerous types.  Drive-by

13   surveillance, actually stationing ourselves in a

14   position where we could observe 93 Elmer Street.

15   Q.   Any video?

16   A.   No.

17   Q.   So as we stand here today you don't have any

18   video of Mr. Howard going in and out of 93 Elmer?

19   A.   No.

20   Q.   Now, do recall that during approximately July

21   through November of 2011 that -- did you surveil 93

22   Elmer during that period of July to November

23   of 2011?

24   A.   Yes.

25   Q.   Stationing yourself outside the home?

1    A.   Yes, sir.

2    Q.   Okay.  Do you recall that there were people

3    going in and out of the home from July to November

4    of 2011?

5    A.   I specifically recall other individuals along

6    with Mr. Howard being present in front of the

7    residence, yes.

8    Q.   Do you recall contractors, people fixing the

9    roofs and fixing the house at 93?

10            MS. MARANGOLA:  Objection, your Honor,

11   leading his own witness.

12            THE COURT:  I'll allow it.  We don't have

13   a jury.  I'm just interested in moving this --

14   BY MR. PENDERGRASS:

15   Q.   Do you recall whether or not there were

16   contractors at that house during that time?

17   A.   I personally do not recall seeing any

18   contractors at the residence.

19   Q.   Okay.  Now, you said there were -- you -- and

20   how many times do you recall seeing Mr. Howard at

21   the residence during that time?

22   A.   I don't recall the exact number of times that I

23   seen Mr. Howard there.

24   Q.   Do you recall whether or not there was anyone

25   living at that residence during the time?

1    A.   I personally was unaware of anybody else living

2    there.

3    Q.   Are you aware of Mr. Howard's address?

4    A.   No, sir.

5    Q.   Well, you were surveilling Mr. Howard, correct?

6    A.   That's correct.

7    Q.   That means -- when I say surveilling him, you

8    were following him around from location to

9    location, correct?

10   A.   No, that's not correct.

11   Q.   You would have to follow -- if you were -- you

12   were doing an investigation for drugs, correct,

13   narcotics investigation, correct?

14   A.   That's correct.

15   Q.   All right.  And in your investigation, did you

16   determine the location where Mr. Howard resided?

17   A.   No.  The only time I actually laid eyes on

18   Mr. Howard would have been when he was present at

19   93 Elmer Street.  Other than that, seeing him at 93

20   Elmer Street, I observed him the night he was

21   arrested at 43 Ruspin.  That was the only other

22   residence I observed Mr. Howard at.

23   Q.   So -- and by the way, did you work with New

24   York State Troopers Grandy --

25   A.   I believe it's Dave Gandy.

1    Q.   Gandy.   And Trooper Hadsall, right?

2    A.   That's correct.

3    Q.   Now, did you ever learn from them that

4    Mr. Howard resided at 231 Palmdale in

5    Williamsville, New York?

6    A.   I was advised that he provided that as his home

7    address, yes.

8    Q.   Okay.   Now, during the investigation, knowing

9    that that was his home address, did you ever follow

10    him from that home address to figure out what he

11    was doing during the day?

12         MS. MARANGOLA:   Objection, your Honor.

13    Relevance to his ties at 93 Elmer.   We're beyond

14    the scope of this hearing.

15         MR. PENDERGRASS:   My position is that he

16    lived at 231 Palmdale and if, in fact, there was an

17    investigation, this officer should have known where

18    he resided.

19         THE COURT:   I'll allow it.

20    BY MR. PENDERGRASS:

21    Q.   Now, did you ever follow him from that address

22    at 231 Palmdale Drive, Williamsville, New York, to

23    ascertain what he was doing during the day?

24    A.   No, sir.

25    Q.   Did you ever learn that Mr. Howard was

1    employed?

2              MS. MARANGOLA:  Objection, your Honor.

3    He's leading his own witness first and foremost,

4    and it's relevance.

5              THE COURT:  We're going to get beyond

6    that.  I'm going to allow that in the context of

7    this hearing.  But, Mr. Pendergrass, where is this

8    going?  I understand that you want some background

9    information, but I want to -- I want to zero in on

10   what's the basis for the conclusion that anything

11   that was found at 93 Elmer or in the Hummer is his.

12             MR. PENDERGRASS:  Okay.  Then I'll go

13   directly to -- to --

14             THE COURT:  Okay.

15             MR. PENDERGRASS:  -- to 93 Elmer.

16   BY MR. PENDERGRASS:

17   Q.  You testified -- well, did you have an

18   opportunity to observe Mr. Howard at 93 Elmer on

19   November 16, 2011?

20   A.  Yes, sir.

21   Q.  And what did you observe?

22   A.  I observed Mr. Howard seated in the driver's

23   seat of a rental vehicle in which he had rented,

24   backed up into the driveway of 93 Elmer Street.

25   Q.  Okay.  So you observed him sitting in a car?

1    A.    That's correct.

2    Q.    All right.  Did you observe -- did you observe

3    him get out of his vehicle and go into the house?

4    A.    No, sir.

5    Q.    Did you observe him get out of his vehicle and

6    go into the -- into the garage?

7    A.    No, sir.

8    Q.    Okay.  So you simply observed him sitting

9    there?

10   A.    That's correct.

11   Q.    All right.  Now -- now after you observed him

12   sitting there, what did he do?  Did he stay there

13   or did he leave?

14   A.    We actually had -- had departed from our

15   surveillance.  I'm unaware of what Mr. Howard had

16   done after we had left.

17   Q.    Okay.  So -- so, you departed.  Do you recall

18   what time it was that you were there surveilling

19   him?

20   A.    It would have been earlier in the afternoon on

21   that day.

22   Q.    Okay.  And then at some point you left?

23   A.    That's correct.

24   Q.    Okay.  And when you say "earlier in the

25   afternoon on that day", do you recall what time in

1    the afternoon?

2    A.   I don't recall the exact time, no.

3    Q.   Okay.  Do you recall approximately how long you

4    were there?

5    A.   It would have been a couple of hours.

6    Q.   It would have been a couple of hours.  Now,

7    while you were there during that couple of hours,

8    did you witness individual contractors come back

9    and forth removing roofing materials from out of 93

10   Elmer?

11   A.   No.

12   Q.   Okay.  Now, did you ever see Mr. Howard get out

13   of his vehicle, go in the back or go to the Hummer

14   and put drugs in --

15   A.   No, sir.

16   Q.   Did you ever see Mr. Howard put any weapon in a

17   Hummer?

18   A.   No.

19   Q.   Okay.  In terms of your surveillance at 93

20   Elmer, did you ever see Mr. Howard stay the night

21   over there?

22   A.   No.

23          MR. PENDERGRASS:  Thank you.  I have

24   nothing further.

25          THE COURT:  Okay.

1  CROSS-EXAMINATION BY MS. MARANGOLA:

2    Q.  Deputy, are you familiar with who owns 93

3    Elmer?

4    A.  Yes.

5    Q.  Is it an individual who has a relationship to

6    the defendant?

7    A.  Yes.  Mr. Howard's fiance, Paula Cruz.

8            THE COURT:  Could you spell her name,

9    please?

10            MS. MARANGOLA:  C-R-U-Z.

11            THE WITNESS:  Yes, first name Paula.

12  BY MS. MARANGOLA:

13    Q.  Miss Cruz lives in Atlanta, is that correct?

14    A.  That's correct.

15    Q.  You indicated you were surveilling 93 Elmer for

16    approximately one year leading up to November

17    of 2011, is that about right?

18    A.  That's correct.

19    Q.  During that year, how many times roughly had

20    you seen the defendant at that premises?

21    A.  I can recall at least on a couple of occasions

22    I observed Mr. Howard present at the residence.

23    Q.  Now, I'll direct your attention to

24    November 16th, 2011.  The defendant was arrested at

25    43 Ruspin, is that correct?

1    A.   That's correct.

2    Q.   Did he have any keys in his possession when he

3    was arrested on that date?

4    A.   Yes, he did.

5    Q.   Did you determine whether those keys had a

6    connection to 93 Elmer?

7    A.   Yes, we did.

8    Q.   In fact, did the defendant have a house key on

9    his person to 93 Elmer on that day?

10   A.   Yes.  Mr. Howard had house keys for 93 Elmer

11   Street.  He also had keys for the garage and he

12   also had a key to the Hummer in his possession.

13            THE COURT:  I'm sorry, a key for the

14   Hummer?

15            THE WITNESS:  Hummer.

16            THE COURT:  Okay.

17   BY MS. MARANGOLA:

18   Q.   There was a separate key to the garage?

19   A.   That's correct.

20   Q.   And the defendant had that on his person when

21   he was arrested, is that correct?

22   A.   Yes.

23   Q.   Now, later that day you executed a search

24   warrant?

25            THE CLERK:  Miss Marangola, I'm not a

1    court reporter.  Slow it down, please.

2              MS. MARANGOLA:  Okay.  I apologize.

3              THE CLERK:  On his person when arrested --

4              MS. MARANGOLA:  Strike the question.

5    BY MS. MARANGOLA:

6    Q.  I'll go back to earlier that day, excuse me.

7    On November 16th of 2011, you conducted

8    surveillance of 93 Elmer Street, is that correct?

9    A.  That's correct.

10   Q.  You indicated you saw the defendant in the

11   driveway?

12   A.  Yes.

13   Q.  Approximately how many hours was he sitting in

14   the driveway?

15   A.  Approximately two hours.

16   Q.  And at that point you left, correct?

17   A.  That's correct.

18   Q.  When you left the premises, was the defendant

19   still sitting in the driveway?

20   A.  Yes, he was.

21   Q.  How far was his vehicle from the garage?

22   A.  He was parked towards the front of the

23   driveway, and the garage was located behind the

24   house.  I can't give you an exact.

25   Q.  Was the defendant alone in the vehicle?

1    A.   Yes, he was.

2    Q.   Was there anyone else coming and going from

3    that premises other than the defendant?

4    A.   No.   We observed the vehicle that Mr. Howard

5    was arrested in later that evening pull up in front

6    of the house.   Nothing really happened.   It left a

7    short time later.

8    Q.   When you executed a search warrant later that

9    evening at 93 Elmer Street you entered the garage,

10   correct?

11   A.   That's correct.

12   Q.   And inside that garage was the defendant's

13   Hummer, is that correct?

14   A.   Yes, that's correct.

15   Q.   Is the Hummer that you searched titled and

16   registered to the defendant?

17   A.   Yes, it is.

18   Q.   And tell us what you found inside that vehicle.

19   A.   We found -- there were a couple of kilos of

20   cocaine located in the vehicle.   And we also

21   recovered three firearms.

22   Q.   Was DNA testing conducted on the three firearms

23   in this case?

24   A.   Yes.

25   Q.   And could the defendant be excluded from

1    handling any one of those three firearms?

2    A.  No, he could not.

3              MS. MARANGOLA:  Thank you, nothing

4    further.

5              THE COURT:  Sir -- Miss Marangola -- well,

6    I'll hear redirect, but I have a question I'm going

7    to interject at some point.  You want me to do it

8    now?

9              MR. PENDERGRASS:  Yes.

10             THE COURT:  All right.  When you say the

11   defendant could not be excluded, what does that

12   mean?

13             MS. MARANGOLA:  Are you asking me or --

14             THE COURT:  Well, I'm asking somebody.

15   Anybody could not be excluded --

16             MS. MARANGOLA:  No, that's not accurate,

17   your Honor.

18             THE COURT:  -- correct?  Well, that's what

19   I'm trying to understand.  What are you saying?

20             MS. MARANGOLA:  DNA testing, the results

21   are indicated by people be excluded.  If your DNA

22   is not on an item, you would be excluded from

23   having touched it.

24             THE COURT:  Okay.

25             MS. MARANGOLA:  So that's -- I know it's

1    wordy, but that's how results for DNA testing are

2    reported.  That said, your Honor, there are

3    multiple contributors to each of the firearms,

4    which means other people touched the firearms as

5    well.

6              THE COURT:  But just -- are you saying his

7    DNA was on it and maybe other people's DNA was on

8    it, is that what you're saying?

9              MS. MARANGOLA:  That's the government's

10   proffer, yes, your Honor.

11             THE COURT:  All right.

12             MR. PENDERGRASS:  Absolutely not.

13             THE CLERK:  Near a microphone.

14             THE COURT:  Wait a second.

15             THE CLERK:  You have to sit or either come

16   to the --

17             THE COURT:  I'm just trying to get at what

18   is meant by the question "Could he be excluded?".

19             MS. MARANGOLA:  When there are multiple

20   donors on a DNA item, your Honor, you can't say --

21   scientists will not say "Your DNA is on the item."

22   That's not how they report the results.  What they

23   will say is, "You could not be excluded."  So what

24   I'm saying is there -- there's DNA on that gun

25   which is consistent with the defendant's.

1          THE COURT:  And might be consistent with

2     somebody else's too?

3          MS. MARANGOLA:  You can't put somebody

4     else's DNA on an item, your Honor.  The reason --

5          THE COURT:  That's what I'm trying to get

6     at.  So if there's DNA on the gun and it's

7     consistent's with defendant's --

8          MS. MARANGOLA:  I'll leave it at that.

9     That's it.

10          THE COURT:  Okay.

11          MR. PENDERGRASS:  Well, your Honor, that

12     belies the representation that she made earlier

13     with regards to the DNA being on the gun when she

14     says his DNA was on the gun and the results are in

15     the billions or the trillions.

16          THE COURT:  Sir, let's -- let's --

17          MS. MARANGOLA:  I believe I was very clear

18     that that was the state case, your Honor, where his

19     DNA is -- the results for that he cannot be

20     excluded and randomly selecting another individual.

21          THE COURT:  We're talking now only about

22     the guns --

23          MS. MARANGOLA:  Correct.

24          THE COURT:  -- found in the Hummer.  Okay.

25     Sir, let me just ask, so perhaps I can get clear

1    here.  And perhaps not.  Sir, was DNA testing done

2    on the guns found in the Hummer?

3                THE WITNESS:  Yes, sir.  We requested that

4    DNA testing be done on those.

5                THE COURT:  Okay.  Has those results come

6    in yet?

7                THE WITNESS:  I just received them earlier

8    this week.

9                THE COURT:  All right.  And do those

10   results indicate that there is a connection between

11   defendant and these guns?

12               THE WITNESS:  Yes, sir.

13               THE COURT:  And how -- how is that?

14               THE WITNESS:  I can only speak to what's

15   written in the report.  I actually didn't perform

16   the testing.  The Erie County Central Police

17   Services laboratory conducted that testing.

18               THE COURT:  Okay.  Do they indicate --

19   I'll allow you to question.  Do they indicate that

20   defendant's DNA is on those guns?

21               THE WITNESS:  Yes, sir.

22               THE COURT:  Do you have the reports here?

23               MS. MARANGOLA:  Yes, I do, your Honor.

24               THE COURT:  Okay.  Could I -- show them to

25   Mr. Pendergrass.

1          MR. PENDERGRASS:  May I inquire now, your

2     Honor?

3          THE COURT:  Yes, you may.

4     REDIRECT EXAMINATION BY MR. PENDERGRASS:

5     Q.  Detective, to say that Mr. Howard's DNA can't

6     be excluded is something different than saying that

7     his DNA is on the gun, correct?

8     A.  I can only speak to what the report says.

9     Q.  Okay.  But -- but the -- the report doesn't

10    say -- in fact, the report says that -- that the

11    major DNA profile from the weapon comes from an

12    unknown male, correct?

13    A.  Again, I'd have to look at the report.

14    Q.  Well, you didn't have to look at the report

15    when she was asking you questions about the

16    exclusion of Mr. Howard's DNA.

17         MS. MARANGOLA:  Your Honor, I'm going to

18    object.  He's impeaching this witness with a report

19    that isn't his.  That's improper.  If the Court

20    would like to review the report, that --

21         THE COURT:  Can I see the report for a

22    minute?  Should we have this marked?

23         MS. MARANGOLA:  It's Government Exhibit 1.

24         THE CLERK:  I'm going to give you labels

25    because I can't mark and type at the same time.

1    Blue for defense, yellow for government.  Use

2    numbers for government.  Blue labels, defendant,

3    are alphabetical letters, please.

4              THE COURT:  So this is Government

5    Exhibit 1?

6              MS. MARANGOLA:  Yes, your Honor.

7              THE COURT:  Okay.  Could I see that,

8    please?

9    BY MR. PENDERGRASS:

10    Q.  So, as you testified, you didn't conduct the

11    experimentation relative to the DNA, right?

12    A.  No, sir.

13    Q.  All you know is what's in the -- in the report,

14    correct?

15    A.  Yes.

16    Q.  You're not an expert on DNA?

17    A.  Absolutely not.

18    Q.  So you don't know -- when it says "defendant

19    can't be excluded", you don't know what that means,

20    right?

21    A.  I know what the "defendant cannot be excluded"

22    means.

23    Q.  Okay.  Now, you've seen DNA reports before,

24    correct?

25    A.  That's correct.

1    Q.  All right.

2              MS. MARANGOLA:  I'm going to object, your

3    Honor.  It's improper impeachment by a report that

4    wasn't generated by this witness.

5              MR. PENDERGRASS:  Well, your Honor, she

6    brought up this report.

7              MS. MARANGOLA:  And it's been submitted to

8    the Court for review.

9              MR. PENDERGRASS:  She brought the report

10   up and she asked him questions about the report.

11             THE COURT:  I'm going to allow the

12   questioning because I still need to understand,

13   whether from this witness or somebody, what the

14   phrase "cannot be excluded" means.  I still don't

15   understand it.  So if this witness can assist in

16   that regard, fine.  If he can't, I'll listen to

17   both of you.

18   BY MR. PENDERGRASS:

19   Q.  Now, you've looked at DNA reports before,

20   correct?

21   A.  That's correct.

22   Q.  And where a person is identified as a

23   contributor of the -- of the DNA, that report says

24   that that person is the contributor of the DNA,

25   correct?

1          MS. MARANGOLA:  Again, objection, your

2    Honor.

3          THE COURT:  He can either answer or not.

4    Maybe he doesn't know, I don't know.  I'm just

5    trying to get to the bottom of this.

6          THE WITNESS:  I've read similar DNA

7    reports in the past.  All that I can tell you is

8    I've submitted firearms and other evidence to the

9    laboratory.  Oftentimes the lab has reported that

10   DNA from the person that we submitted is a possible

11   contributor, has come back as not being a

12   contributor and has been excluded.

13       In this instance all I know is the report is

14   telling us that the defendant cannot be excluded,

15   and I can only go on what the report says.

16   BY MR. PENDERGRASS:

17   Q.  This report doesn't say that the defendant is a

18   match, right?

19   A.  No, it says the defendant cannot be excluded.

20   Q.  It doesn't say that defendant is a match,

21   right?

22          THE COURT:  I've seen the report and it

23   doesn't say that.  So we're good on that.

24          MR. PENDERGRASS:  And, in fact, Detective,

25   you've seen other reports where, in fact, it's been

1    declared that the defendant is the person that

2    contributed DNA to a particular item in the

3    billions or quadrillions, right?

4            MS. MARANGOLA:  Objection, your Honor,

5    relevance.

6            THE COURT:  No, I'll allow it.  We're

7    going to move on from this pretty quickly, because

8    he's already said he's not an expert in DNA, and

9    he -- other than what the report says, he

10   doesn't -- sir, I'm not trying to put words in your

11   mouth, but that's my recollection -- other than

12   what the report says, you don't know what the

13   results were here, is that correct?

14           THE WITNESS:  That's correct.

15           THE COURT:  Okay.

16   BY MR. PENDERGRASS:

17   Q.  Okay.  Now, at 93 Elmer, there's something that

18   separates -- there's something that separated the

19   defendant's car from -- the car that the

20   defendant -- the car that the defendant was sitting

21   in, from the garage, correct?

22   A.  That's correct.

23   Q.  And what is that?

24   A.  It's a wooden fence.

25   Q.  Stockade fence, right?

1    A.   It's a wooden stockade fence.

2    Q.   Yeah.  Long -- with long wooden like sticks

3    that come up to a point?

4    A.   Yes.

5    Q.   Okay.  And that -- that fence you would agree

6    with me is over 6 feet tall?

7    A.   It's tall.  It's approximately six foot or

8    taller.

9    Q.   Okay.  Now, you testified that -- who owns the

10    property at 93 Elmer?

11    A.   Paula Cruz.

12    Q.   Okay.  And Paula Cruz is -- is related to the

13    defendant how?

14    A.   I believe that's the defendant's fiance.

15    Q.   Okay.  You know that Paula Cruz runs a real

16    estate business?

17    A.   No, I did not.

18    Q.   Did you know that she was renting that house

19    out at 93 Elmer?

20    A.   We later learned that somebody was going to be

21    renting the apartment.

22    Q.   Well, did you know that on November 16, 2011,

23    that there was actually someone else living at 93

24    Elmer Avenue?

25    A.   No, I did not.

1    Q.   So -- so let me -- so you didn't know that

2    there was someone actually living at 93 Elmer

3    Avenue on November 16th, 2011?

4    A.   Correct.

5    Q.   You didn't know that there was someone actually

6    living in 93 Elmer Avenue on November 11 -- as of

7    November 11, 2011?

8    A.   No.  Again, I did not know that someone was

9    actually residing in the residence.  We later

10   learned that it had been rented out.

11   Q.   Okay.  And you learned that it was rented out

12   as early as November 11, 2011, correct?

13   A.   I don't recall the exact date.  I'm just going

14   off what you were saying.

15   Q.   All right.  Now, you said you were

16   investigating Mr. Howard's narcotics trafficking.

17   Can you tell me where Mr. -- did you surveil

18   Mr. Howard from October 31st to November 11th?

19          MS. MARANGOLA:  Objection, your Honor,

20   asked and answered.

21          MR. PENDERGRASS:  I never asked that

22   question.

23          THE COURT:  I'll allow it.

24   BY MR. PENDERGRASS:

25   Q.   Did you surveil him in October 31st to

1    November 11th?

2    A.  I don't recall off the top of my head.

3    Q.  Did you -- did you know that Mr. Howard was in

4    Atalanta, Georgia, during that time?

5    A.  No, I did not.

6    Q.  Okay.  So -- so you got surveillance on

7    Mr. Howard for a year, right?

8    A.  That's correct.

9    Q.  And you don't know that Mr. Howard is in

10   Atlanta, Georgia, from October 31st to November the

11   11th, correct?

12   A.  That's correct.

13   Q.  And you don't know that someone else is

14   residing in that house at 93 Elmer as of November

15   11, 2011, correct?

16   A.  That's correct.

17          MR. PENDERGRASS:  Nothing further, your

18   Honor.

19          THE COURT:  Thank you.  Anything further?

20          MS. MARANGOLA:  Very brief re-cross.

21   RECROSS-EXAMINATION BY MS. MARANGOLA:

22   Q.  The evening you executed the search warrant at

23   93 Elmer Street, were there dogs present?

24   A.  Yes, there were.

25   Q.  Where were the dogs?

1    A.   They were in the backyard of the residence.

2    Q.   Did there come a point where you had to shoot

3    one of the dogs for safety reasons?

4    A.   Yes.  Another law enforcement officer with us

5    shot one of the dogs.

6    Q.   Who did that dog belong to?

7    A.   Mr. Howard.

8           MS. MARANGOLA:  Thank you.  Nothing

9    further.

10          THE COURT:  Thank you, sir.  You may step

11   down.  Do you have other witnesses?

12          MR. PENDERGRASS:  Yes, your Honor, at this

13   time call Harold Howard.

14          THE COURT:  Okay.

15   H A R O L D   H O W A R D, having been duly sworn as

16   a witness, testified as follows:

17          THE CLERK:  Please state your name for the

18   record, spelling your first and last.

19          THE WITNESS:  Harold Howard, H-A-R-O-L-D

20   H-O-W-A-R-D.

21          THE CLERK:  Thank you, sir.

22   DIRECT EXAMINATION BY MR. PENDERGRASS:

23   Q.   Good morning, Mr. Howard.  How are you?

24   A.   Fine.  You, Mr. Pendergrass?

25   Q.   Doing well.  Mr. Howard, prior to being housed

1    at the Erie County Correctional Facility, where did

2    you reside?

3    A.    231 Palmdale Drive, Apartment 5, Williamsville,

4    New York 14221.

5    Q.    And how long have you resided at that address?

6    A.    For the past five years.

7    Q.    Okay.  And who do you reside there with?

8    A.    My aunt, Jessie Serose (phonetic).

9    Q.    Now, I want to call your attention to

10   November 16, 2011.  Do you recall that day?

11   A.    Yes, sir.

12   Q.    And can you tell me what you recall about that

13   day?

14   A.    I was arrested that day.

15   Q.    Okay.  And where were you arrested?

16   A.    At 43 Ruspin.

17   Q.    Okay.  And how long were you detained at 43

18   Ruspin before you were arrested?

19   A.    I believe at 5:45 police arrived, and I was

20   there ever since.

21   Q.    Okay.  Do you recall approximately what time

22   you were actually placed under arrest and by who?

23   A.    It would have been somewhere around

24   8:00 o'clock by a Buffalo police officer who put me

25   in handcuffs and placed me in the back seat of a

1    car.

2    Q.  Now, at some point -- do you recall what was

3    going on at Ruspin prior to your arrest?

4    A.  They had a search warrant for 43 Ruspin

5    upstairs and said they was looking for an

6    individual by the name of John Thurman, who was

7    5'8", 285 pounds.  And I told them that's not me.

8    And I asked them, if I'm being arrested, can I call

9    my lawyer?

10   Q.  Okay.  And were you allowed to call your

11   lawyer?

12   A.  No.

13   Q.  Okay.  At some point on the day -- can you tell

14   the Court -- you said you got arrested somewhere

15   around 8:00 o'clock?

16   A.  Yes, sir.

17   Q.  At some point did someone return with another

18   warrant?

19   A.  Yes, sir.

20   Q.  Okay.  And approximately what time was that?

21   A.  Around the same time, 8:00 o'clock.

22   Q.  Okay.  And that was a warrant for the 43

23   Ruspin?

24   A.  Yes, sir, it would have been downstairs.

25   Q.  After you were arrested, what happened to you

1    next?

2    A.   They took me to a place on Eagle Street, and I

3    sat there till like one or two o'clock in the

4    morning.

5    Q.   All right.  So at some point did they search

6    you?

7    A.   Yes.

8    Q.   Did they take keys from out of your pocket?

9    A.   Yes.

10   Q.   Okay.  Now, the keys that you had in your

11   pocket, were they -- did they have on the chain

12   keys to the Hummer?

13   A.   Yes.

14   Q.   Okay.  And why did they have keys to the Hummer

15   on the chain?

16   A.   Because I have a Hummer.

17   Q.   Okay.  Did they have keys to 93 Elmer?

18   A.   Yes.

19   Q.   And why did they have keys for 93 Elmer?

20   A.   Because I had to get keys made for the

21   contractors that were doing the work over there and

22   also for the tenant that had moved in.

23   Q.   Okay.  So you had -- now, who owns 93 Elmer?

24   A.   My fiance, Paula Cruz.

25   Q.   Okay.  And do you know how long she's owned 93

44

1    Elmer?

2    A.   I believe for the past four or five years.

3    Q.   Okay.  Now, prior to -- well, strike that.  Let

4    me go back.  Now, at some point did 93 -- was 93

5    Elmer rented?

6    A.   Yes, sir.

7    Q.   Okay.  Can you explain to the Court at what

8    point 93 Elmer was rented?

9    A.   I believe the guy started the work in August.

10   Q.   Not when the -- when the work started.  At what

11   point was 93 Elmer --

12   A.   The tenant actually moved in November 11.

13   Q.   At 93 Elmer?

14   A.   Yes, sir.

15   Q.   Did -- were -- were -- now, you said the tenant

16   moved in in November, November 11th, 2011?

17   A.   Yes, sir.

18   Q.   Did you have to perform some work at 93 Elmer?

19   A.   Me personally, no.

20   Q.   Okay.  Did you have to hire anyone to perform

21   work at 93 Elmer?

22   A.   Yes, there was work -- there were contractors

23   hired because the tenant was on Section 8, and

24   there was -- the house had to be brought up to

25   code.

1    Q.   Okay.  And do you recall who was hired to do

2    the work?

3    A.   I believe the company was -- goes by the name

4    of Frontier.

5    Q.   Okay.  I'm going to show you what's been marked

6    as --

7              MS. MARANGOLA:  Can I see that?

8    BY MR. PENDERGRASS:

9    Q.   -- Defendant's Exhibit A for identification.

10   By the way, did Miss Howard ask you to oversee the

11   project at 93 Elmer -- I mean Miss Cruz?

12   A.   Yes.  She asked me to check on it from time to

13   time.

14   Q.   Okay.  Showing you what's been marked as

15   Defendant's A for identification -- your Honor, can

16   I approach?

17             THE COURT:  You may.

18             THE CLERK:  Just --

19             THE COURT:  What?

20             THE CLERK:  Go here to speak to the

21   witness.  You have to speak into this microphone.

22             THE COURT:  He's not going to.

23             THE CLERK:  If there is going to be any

24   speaking to the witness, this microphone is here

25   for whoever.  All right.

1   BY MR. PENDERGRASS:

2   Q.   Mr. Howard, I'm showing you what's been marked

3   as Defendant's Exhibit A for identification.  Can

4   you explain to the Court what that is?

5   A.   It's a bid proposal for work to be done at 93

6   Elmer.

7   Q.   Okay.  And did you receive that bid proposal

8   from Paula Cruz?

9   A.   Yes, after she received it from the contractor.

10  Q.   Okay.  And so -- so at some point were you

11  required to go over to 93 Elmer in terms of

12  supervising or in terms of ensuring that work was

13  being done at 93 Elmer?

14  A.   Yes, sir.

15  Q.   Okay.  And was that the limited purpose for you

16  being at 93 Elmer?

17  A.   Yes, sir.

18  Q.   Did you ever reside at 93 Elmer?

19  A.   No, sir.

20  Q.   Now, at some point your motor vehicle ended up

21  at 93 Elmer?

22  A.   Yes, sir.

23  Q.   Okay.  Can you explain to the Court why your

24  vehicle was parked at 93 Elmer?

25  A.   I put the vehicle there because I wasn't

1    driving it anymore, and felt like it was a safe

2    location for it, so -- gas prices were high at the

3    time, and I just wasn't using the vehicle anymore.

4    Q.  Okay.  And how long had the vehicle been parked

5    at 93 Elmer?

6    A.  I parked it there back in sometime of August,

7    around the middle of August.

8    Q.  Okay.  So you parked the vehicle at 93 Elmer in

9    the middle of August and you left it there?

10   A.  Yes.

11   Q.  Okay.  Now -- and between -- and between the

12   middle of August to November of -- November,

13   16th, 2011, did you operate --

14   A.  No, sir.

15   Q.  -- that motor vehicle?

16   A.  No, sir.

17   Q.  Did you go into that motor vehicle for any

18   reason?

19   A.  No, sir.

20   Q.  Now, in -- by the way, that -- that -- the

21   contractor, can you explain to the Court how long

22   you worked on the residence at -- residence at 93

23   Elmer?

24   A.  He was there from the time he started the work

25   up until November 16th, the day he came and got the

1    rest of his material out the yard.

2    Q.  Okay.  In fact, I want to show you what's been

3    marked as Defendant's -- Defendant's Exhibit B for

4    identification.  In fact, at some point you were --

5    you learned that -- that there was still repairs

6    that had to be completed at 93 Elmer, correct?

7    A.  Yes, sir.

8    Q.  That inspection was going to take place on

9    November 9, 2011?

10   A.  Yes, sir.

11          MR. PENDERGRASS:  May I approach?

12          THE COURT:  You May.

13   BY MR. PENDERGRASS:

14   Q.  I'm showing you what's been marked as

15   Defendant's Exhibit B for identification.  Can you

16   explain to the Court what that is?

17   A.  It's a letter from the Rental Assistance

18   Corporation.

19          THE CLERK:  I'm not hearing you.  Letter

20   from --

21          THE WITNESS:  The Rental Assistance

22   Corporation of Buffalo, states that repairs must be

23   completed by November 9th, 2011.  We will schedule

24   a reinspection for November 9, 2011.  You must

25   telephone extension 150 to schedule a reinspection

1      for an earlier date.  If you fail to have the

2      repairs completed and a reinspection conducted by

3      November 9th, 2011, the RTA submitted will be

4      denied and the tenant will be informed to locate a

5      new unit.  Thank you for your cooperation.  If you

6      have any questions on the repairs, please contact

7      me at the above extension number.

8    BY MR. PENDERGRASS:

9      Q.  Mr. Howard, just for further references, I

10     don't want you to read the document.  I just want

11     you to look at it and identify what it is.

12     A.  Okay.

13     Q.  So that's a letter informing Miss Cruz that

14     further repairs needed to be done and an inspection

15     was going to be --

16     A.  Yes, sir.

17     Q.  At some point did Miss Cruz inform you of that?

18     A.  The date of this inspection I wasn't in

19     Buffalo.

20     Q.  Okay.  But did you learn that -- that they were

21     going -- there was going to be another inspection?

22     A.  Yes, sir.

23     Q.  Okay.  Now, you said that the date of that

24     inspection you weren't in Buffalo.

25     A.  Yes, sir.

1    Q.   Where were you?

2    A.   Atlanta, Georgia.

3    Q.   All right.  And how long had you been in

4    Atlanta, Georgia?

5    A.   I left October 31st, and I returned November

6    10th.

7    Q.   So you were out of Buffalo from October 31st to

8    November 10th?

9    A.   Yes, sir.

10    Q.   All right.  Do you recall how did you get to

11    Atlanta, Georgia?

12    A.   AirTran.

13            THE CLERK:  I didn't get that.  What's the

14    answer?  Get to Atlanta, Georgia how --

15            THE WITNESS:  AirTran.

16            THE CLERK:  AirTran.  Thank you.

17            THE COURT:  Is that to show that he flew

18    to Atlanta?

19            MR. PENDERGRASS:  Yes, I mean --

20            MS. MARANGOLA:  Why is this relevant?

21            THE COURT:  Well, unless you're going to

22    contest that he was in Atlanta from October 31st to

23    November 10th, I think he's testified, I don't

24    expect there will be other testimony to the

25    contrary.

1          MS. MARANGOLA:  I would ask for a copy of

2     this though.  And all items that have been marked

3     for identification.

4          MR. PENDERGRASS:  (Indiscernible.)

5          THE COURT:  Folks, look, you know, we are

6     having a hearing here.  I do want to move it along.

7     Nothing has been offered in evidence yet, unless

8     you want to offer it, but --

9          MS. MARANGOLA:  If I can have a moment to

10     look at the bank statement that was --

11          THE COURT:  Sure.

12          MS. MARANGOLA:  Thank you.

13          MR. PENDERGRASS:  May I continue while she

14     is going --

15          THE COURT:  Yes.  Yes.

16          MR. PENDERGRASS:  So from October -- so

17     from October 31st to November 11th you weren't in

18     the city of Buffalo?

19          THE COURT:  Was it --

20     BY MR. PENDERGRASS:

21     Q.  November 10th, I'm sorry.

22     A.  Yes, sir.

23     Q.  Okay.  And now when you returned to Buffalo on

24     November 10th, can you tell me whether or not the

25     house at 93 Elmer was, in fact, rented at that

52

1    time?

2    A.   No, sir.

3    Q.   Okay.  Did someone -- after you returned to

4    Buffalo on -- did you have the occasion of moving

5    someone into 93 Elmer?

6    A.   Yes.

7    Q.   Okay.  And do you recall what date that was on?

8    A.   On the 11th of November.

9    Q.   So -- so, let me see if I can get this right.

10   From October 31st to November the 10th you weren't

11   in Buffalo?

12   A.   Yes, sir.

13   Q.   And then on the 11th of November you moved

14   someone in to the -- to the house at 93 Elmer?

15   A.   Yes, sir.

16   Q.   Right.  Now, from November the 11th to November

17   the 16th, 2011, had you entered the house at 93

18   Elmer?

19   A.   Only when helping move Miss Lee's stuff into

20   the apartment.

21   Q.   Okay.  But after that, had you gone back into

22   the house?

23   A.   No, sir.

24          THE COURT:  Mr. Pendergrass, just a minute

25   please.

53

1            Miss Lewis, we have an arraignment at 11, is

2       that right?

3                 THE CLERK:  Yes, Judge.

4                 THE COURT:  All right.  I'm sorry?

5                 MS. MARANGOLA:  Take a recess.

6                 THE COURT:  I'm sorry?

7                 THE CLERK:  I need a break too, Judge.

8                 THE COURT:  Okay.  Why don't we break

9       shortly.  We'll do the arraignment, and -- and then

10      we'll reconvene.

11                MR. PENDERGRASS:  Judge, can I have 20

12      minutes?  Can I just run over to Buffalo City Court

13      and come back?

14                THE COURT:  Sure.  Sure.

15                MR. PENDERGRASS:  Thank you.

16                THE COURT:  Okay.  Thank you.  You may

17      step down, sir.

18                (Short recess was taken.)

19                THE CLERK:  And we're back on the record

20      In the matter of United States versus Harold

21      Howard.  All parties present.  The Honorable

22      Jeremiah McCarthy presiding.

23                MR. PENDERGRASS:  May I continue?

24                THE COURT:  You may.

25                MR. PENDERGRASS:  Thank you.

1    BY MR. PENDERGRASS:

2    Q.   Good morning again, Mr. Howard.

3    A.   Morning, sir.

4    Q.   Okay.  Now I believe we were -- we were talking

5    before we left -- left off we were talking about a

6    contractor being at the house.

7    A.   Yes, sir.

8    Q.   Do you recall -- well, how did the contractor

9    make it into the home?

10    A.   He had keys.

11    Q.   All right.  And do you recall whether or not he

12    had a crew of individuals working with him?

13    A.   He did.

14    Q.   Okay.  Do you recall about approximately how

15    many?

16    A.   He had a ground crew.  He had guys on the roof.

17    Four or five including himself.

18    Q.   Okay.

19    A.   About six people.

20    Q.   Did the -- did he ever give you back the keys

21    to the house?

22    A.   On November 16th he did.

23    Q.   So on November 16th, 2011, the person that was

24    working on the house gave you back the key?

25    A.   Yes, sir.

1    Q.   Now, you don't know whether or not he made

2    copies of the key?

3    A.   I wouldn't know that.

4              THE CLERK:  Speak up, sir.

5              THE WITNESS:  I wouldn't know that.

6    BY MR. PENDERGRASS:

7    Q.   Okay.  Now, you heard testimony from Detective

8    Granville, correct?

9    A.   Yes, sir.

10   Q.   Could you explain to the Judge why you were at

11   the house on November 16th, 2011?

12   A.   Mainly just to make sure Miss Lee had been

13   settled in, and if she needed any assistance with

14   anything.

15   Q.   Okay.  And now at some point while you were at

16   the house did the contractor have occasion to come

17   over?

18   A.   Yes, he did.

19   Q.   Okay.  And what did he come over for?

20   A.   To get his materials that he had in the

21   backyard and in the garage.

22   Q.   Okay.  So, the contractor had materials in the

23   backyard and in the garage of the house?

24   A.   Yes, sir.

25   Q.   Okay.  And how did he get into the backyard and

1    into the garage of the house?

2    A.   He had a key.

3    Q.   He had a key to the backyard?

4    A.   Yes, sir.

5    Q.   Into the garage of the house?

6    A.   Yes, sir.

7    Q.   And the garage of the house is where he stored

8    his material?

9    A.   Yes, along -- also in the basement.  He had

10   material in the basement.

11   Q.   Okay.  But I want to concentrate on the

12   backyard and the garage.  The contractor had keys

13   to get into the house?

14   A.   Yes, sir.

15   Q.   And he had access to the backyard?

16   A.   Yes, sir.

17   Q.   And had access to the garage?

18   A.   Yes, sir.

19   Q.   And that would mean also that the individuals

20   that were working with the contractor had such

21   access?

22   A.   Yes, sir.

23   Q.   Now, at some point on or about November 9th or

24   after did you learn that there still needed to be

25   repairs done at 93 Elmer Avenue?

1    A.  Yes, sir.

2    Q.  Okay.  I'm showing you what's been marked as

3    Defendant's Exhibit D for identification.

4         MR. PENDERGRASS:  Your Honor, may I

5    approach?

6         THE COURT:  You may.

7         THE CLERK:  Is that D as in David?

8         MR. PENDERGRASS:  D as in David.

9         THE CLERK:  Okay.  Thank you.

10   BY MR. PENDERGRASS:

11   Q.  Can you tell me what that is?

12   A.  It's a list of required repairs.

13   Q.  Okay.  And at some point did -- did Miss Cruz

14   give that to you so that you could direct the

15   contractor making repairs?

16   A.  I believe the contractor was present on the

17   date of this inspection.

18   Q.  Okay.  And so the contractor knew what repairs

19   needed to be done on the date of that inspection?

20   A.  Yes, sir.

21   Q.  And you weren't there on the date of that

22   inspection, correct?

23   A.  No, sir.

24   Q.  And so the contractor had -- so is it my

25   understanding that the contractor walked through

1    the property with the rental agent?

2              MS. MARANGOLA:  Objection, your Honor.  He

3    wasn't there.

4              THE COURT:  Yeah, how is he going to know?

5              MR. PENDERGRASS:  Okay.

6    BY MR. PENDERGRASS:

7    Q.  Did you learn how -- at that point did you

8    learn how the inspection of the property was

9    conducted on November 9, 2011?

10   A.  Yes, I learned from Miss Lee.

11   Q.  Okay.  And what did you learn?

12   A.  She told me there was a list of things that

13   needed to be done and that the guy was taking care

14   of it.

15   Q.  Okay.  And so the contractor worked in that --

16   I think you testified he worked in the home through

17   November 16th, 2011?

18   A.  Yes, sir.

19   Q.  At which point he came back to retrieve his

20   material?

21   A.  Yes, sir.

22             MR. PENDERGRASS:  Your Honor, at this time

23   I move Defendant's Exhibits A, B, and D into

24   evidence.

25             THE COURT:  Any objection?

1           MS. MARANGOLA:  No, your Honor.

2           THE COURT:  Just curious, why isn't there

3      a Defendant's Exhibit C, or was that just an

4      oversight?

5           MS. MARANGOLA:  I'm going to move that in

6      as well when it's my turn, your Honor.

7           THE COURT:  What is Defendant's Exhibit C?

8      I don't even know.

9           MS. MARANGOLA:  Bank records.

10          THE COURT:  I'm sorry?

11          MS. MARANGOLA:  The defendant's bank

12     record.

13          THE COURT:  Oh, okay.

14          MS. MARANGOLA:  And again I do request a

15     copy of all exhibits that are into evidence.

16          MR. PENDERGRASS:  Well, in fact, my client

17     never had an opportunity to look at Exhibit C

18     because they stipulated that -- that he was -- so I

19     never used that as an exhibit.

20          THE COURT:  All right.  Well, first of

21     all, with respect to Defendant's Exhibits A, B, and

22     D there's no objection, is that right?

23          MS. MARANGOLA:  No, your Honor.

24          THE COURT:  Okay.  So, Defendant's

25     Exhibits A, B, and D are in evidence.

```
1                    (Defendant's Exhibit A, B, and D were

2                    received into evidence.)

3                    THE COURT:  And then, Miss Marangola,

4        we'll take up Exhibit C in a moment, because you're

5        not offering it, right?

6                    MR. PENDERGRASS:  Well, I --

7                    THE COURT:  She hasn't offered it yet.

8        You're not offering it?

9                    MR. PENDERGRASS:  But it was never even

10       offered as an exhibit.

11                   THE COURT:  I understand.

12                   MR. PENDERGRASS:  If the Court recalls, I

13       pulled it out to use it as an exhibit, and then

14       they simply stipulated that my client was gone from

15       October 31st to November 10th.

16                   THE COURT:  Well, that --

17                   MR. PENDERGRASS:  It was just for the --

18       it was for the limited purpose of showing that he

19       was in Atlanta, Georgia.

20                   THE COURT:  All right.  Well, we'll take

21       that up if and when she offers it.

22                   MS. MARANGOLA:  Can I please see Defense

23       Exhibit C that he's referring to?

24                   MR. PENDERGRASS:  Your Honor, it is not --

25       it is not an exhibit.  It has not been an exhibit
```

1    offered.

2            THE COURT:  You've already showed it to

3    her.  Show it to her again.  I'm not saying it's

4    coming in or that it's not coming in.

5            MS. MARANGOLA:  Thank you, your Honor.

6    RECROSS-EXAMINATION BY MS. MARANGOLA:

7    Q.  Now, Mr. Howard, you indicated earlier that

8    your fiance owns 93 Elmer Street.

9    A.  Yes, ma'am.

10   Q.  And she lives in Atlanta, Georgia?

11   A.  Yes, ma'am.

12   Q.  While she's gone, you are the main person to

13   oversee that property for her, correct?

14   A.  I wouldn't say that, the main person to oversee

15   the property.  I was there to check on the work

16   that was being done, ma'am.

17   Q.  Right.  And you're the person, as her fiance,

18   who would take on that responsibility?

19   A.  Yes, ma'am.

20   Q.  Because you're going to be her spouse one day?

21   A.  Yes, ma'am.

22   Q.  And that property would ultimately be yours as

23   well?

24   A.  Yes, ma'am.

25   Q.  So, since you lived in the area, you took on

1    the responsibility to make sure the house was safe,

2    correct?

3    A.   Yes, ma'am.

4    Q.   And that the work was being done as she wanted

5    it?

6    A.   Yes, ma'am.

7    Q.   And, in fact, you said it was a safe location,

8    and that's why you stored your 2008 Hummer in the

9    garage?

10   A.   Yes, ma'am.

11   Q.   Because that building is a safe location that

12   you need keys to enter?

13   A.   Yes, ma'am.

14   Q.   And you had a primary set of keys to that

15   location, correct?

16   A.   Yes, ma'am.

17   Q.   And, in fact, the garage where you store your

18   Hummer in, that's a secure location as well?

19   A.   Yes, ma'am.

20   Q.   And you can't get into that garage without a

21   set of keys?

22   A.   No, you can't.

23   Q.   And, in fact, how much did you pay for that

24   Hummer?

25            MR. PENDERGRASS:   Objection.

1            THE WITNESS:  The Hummer --

2            MR. PENDERGRASS:  Objection.  Relevance to

3      this proceeding.

4            THE COURT:  What's the relevance?

5            MS. MARANGOLA:  I'll tie it up, your

6      Honor.

7            THE COURT:  I'll give limited leeway

8      subject to tying it up.

9            THE WITNESS:  The Hummer is not paid for,

10     ma'am.  I had a 39-month lease, and at the end of

11     my lease I did an option to buy, and I currently

12     owe $32,000 on the Hummer.  My monthly payment is

13     782 a month.

14     BY MS. MARANGOLA:

15     Q.  $782 a month?

16     A.  Yes, ma'am.

17     Q.  Obviously that's an expensive vehicle by all

18     accounts, which is why you take good care of it and

19     keep it in a secure location?

20     A.  Yes, ma'am.

21     Q.  Why you don't leave it on the street, right?

22     A.  Yes, ma'am.

23     Q.  Now, you also own another car, a Ford Focus,

24     isn't that correct?

25            MR. PENDERGRASS:  Objection.

1          THE COURT:  Yeah, this is -- how does this

2     tie into the scope of direct?

3          MS. MARANGOLA:  Well, your Honor, the

4     defendant was seen in a rental vehicle, so I'm

5     trying to understand why, if he owns two vehicles,

6     he's renting vehicles on the side, which obviously

7     this Court knows, is something that drug dealers

8     often do.

9          MR. PENDERGRASS:  Objection, your Honor.

10          THE COURT:  No.  No, the purpose of this

11     hearing was to explore and only to explore as far

12     as I'm concerned his ties to the premises and to

13     the Hummer vehicle, because it's the Hummer vehicle

14     in which -- from which the contraband was seized.

15          MS. MARANGOLA:  And the Court did give

16     great latitude to the defendant, and I would ask

17     for the same courtesy at this time, your Honor.

18          THE COURT:  Well, I certainly try to be

19     courteous to everyone.  I'm just trying to

20     understand what this has to do with that at all.

21          MS. MARANGOLA:  The day of the search

22     warrant he's seen in a rental vehicle, and I'm

23     trying to understand, if he has a vehicle in the

24     garage, why he's renting a vehicle.  So that's what

25     I'm exploring at this point, your Honor.  Maybe he

1    has a legitimate reason.

2              THE COURT:  I'll give you limited leeway

3    in that regard.

4              MS. MARANGOLA:  Thank you.

5         Now, in addition to the Hummer, you own a

6    secondary vehicle?

7              THE WITNESS:  Yes, ma'am.

8              MR. PENDERGRASS:  Objection.

9              THE COURT:  Same ruling.  Overruled.

10             MS. MARANGOLA:  Thank you.

11        And you own that car outright.  In fact, you're

12   planning on selling it for $7,500?

13             MR. PENDERGRASS:  Objection.  What's the

14   relevance?

15             THE COURT:  She says she is going to tie

16   it in.  We'll see if she does, and if she doesn't,

17   all of this will be stricken.

18             THE WITNESS:  Yes, ma'am, I purchased the

19   car from an auto insurance auction.  The vehicle is

20   totaled.  I paid $2,200 for it, and I did all the

21   repairs to get it -- to bring it up to date, so I

22   could have it inspected to sell.

23   BY MS. MARANGOLA:

24   Q.  So that's a yes, you own a Ford Focus?

25   A.  Yes, ma'am.

1    Q.   And back on November 16th, 2011, you owned that
2    Ford Focus?  Yes?
3    A.   Yes, I owned the vehicle --
4    Q.   Thank you.
5    A.   -- but you can't drive it.
6    Q.   Have you been doing work on it since you've
7    been incarcerated?
8    A.   No, ma'am.
9    Q.   But it's in driving condition at this point?
10   A.   It has to be inspected, ma'am.  It has to have
11   an insurance inspection before the vehicle can -- a
12   New York State insurance inspection before it
13   can -- a title can be delivered for the vehicle.
14   Q.   I understand that.  But it is in driving
15   condition as you sit here today, isn't it?
16   A.   No, it's not.
17   Q.   If I got behind the wheel of that vehicle and
18   pushed my foot to the pedal, would it go forward?
19   A.   It would go forward, ma'am --
20   Q.   Thank you.
21   A.   -- but you don't have plates for the vehicle.
22   You can't register it or insure it.
23   Q.   Now, you also -- going back to the garage at 93
24   Elmer, you moved your car into that garage into the
25   secure location and put the garage door down,

1    correct?

2    A.  Yes, ma'am.

3    Q.  And you had access to that because you had

4    keys, correct?

5    A.  Yes, ma'am.

6    Q.  And the Hummer itself, you own that, you don't

7    share that car with anybody?

8    A.  I have on occasion let people use the vehicle.

9    Q.  But you were the one who physically pulled it

10   into that garage, isn't that correct?

11   A.  Yes, ma'am.

12   Q.  And you locked it up?

13   A.  I locked the garage.  I don't recall if I

14   locked the vehicle.

15   Q.  As you sit here today you don't know, either

16   way, if you locked the vehicle or if you didn't?

17   A.  Right.  I just -- I put the vehicle in the

18   garage back in about the middle of August.

19   Q.  And you didn't give anyone permission to drive

20   that vehicle once you put it into the garage?

21   A.  No, ma'am, I didn't.

22   Q.  Right, because you have the set of keys to that

23   car?

24   A.  I'm not the only one with a set of keys, ma'am.

25   Q.  Who else has a set of keys to that car?

68

1    A.    My co-defendant.

2    Q.    Your girlfriend Paula Cruz?

3    A.    My co-defendant, ma'am.

4    Q.    Who is your co-defendant?

5    A.    Myron Johnson.

6    Q.    Myron Johnson has keys to that vehicle?

7    A.    Yes.

8    Q.    Is he the only other person who has keys to

9    that vehicle?

10   A.    Yes.

11   Q.    He doesn't have keys to the garage, isn't that

12   correct?

13   A.    He had a set of keys to everything over there,

14   ma'am.  His mother was -- when I wasn't able to go

15   by and check on the property, he was because his

16   mother was the one that was going to be renting the

17   location.

18   Q.    Your co-defendant Myron Johnson's mother was

19   the person who was going to move into that

20   location, correct?

21   A.    She did eventually move in.

22   Q.    And you would agree then on November 16th of

23   2011, the day you were arrested, there were boxes

24   everywhere in 93 Elmer?

25         MR. PENDERGRASS:  Objection.

1          THE COURT:  What's the objection?

2          MR. PENDERGRASS:  Relevance to the boxes

3     being everywhere at 93.

4          MS. MARANGOLA:  He's saying someone was

5     living there, and I'm indicating she hadn't moved

6     in fully yet.

7          THE COURT:  Okay.  I'll allow it.

8          THE WITNESS:  She moved in on the 11th.

9   BY MS. MARANGOLA:

10   Q.  Her items were not unpacked on that date, isn't

11   that correct?

12   A.  I don't know if she unpacked everything or not,

13   but I helped her move everything into the house

14   so --

15   Q.  On the 11th, is your testimony?

16   A.  Yes.

17   Q.  In fact, you indicated earlier that the reason

18   you were sitting in the driveway of 93 Elmer was to

19   check on -- what is her name?

20   A.  Deborah Lee.

21   Q.  Deborah Lee.

22   A.  Yes, ma'am.

23   Q.  And you were sitting in the driveway to wait to

24   see if she came to that location?

25   A.  Yes.

1    Q.  And you waited for over two hours to see if she

2    came to that location?

3    A.  Yes.

4    Q.  And she never came?

5    A.  She eventually showed up.

6    Q.  And you sat there for over two hours waiting

7    for her?

8    A.  Yes, ma'am.

9    Q.  And you sat there because you didn't have means

10   to get ahold of her to know when she was coming?

11   A.  Well, I sat there waiting on her.  That's it.

12   I knew that she would be coming soon.

13   Q.  And after the first half an hour you never

14   placed a call to her?

15        MR. PENDERGRASS:  Objection.

16        THE WITNESS:  I didn't have to place a

17   call, ma'am.  I knew she was coming.

18        THE COURT:  We're really, I think -- this

19   line of questioning, I don't see as being

20   particularly relevant.

21        MS. MARANGOLA:  Well, Judge, I'm wondering

22   why he's sitting in the driveway 10 feet from where

23   three firearms and 3 kilos of cocaine are.  I'm

24   asking if he has a legitimate reason for being

25   there.  I think that's fair cross.

1          MR. PENDERGRASS:  Your Honor, legitimate

2     reason is because he can sit anywhere in the United

3     States.

4          MS. MARANGOLA:  Judge, could I finish my

5     questioning?

6          THE COURT:  Look, folks --

7          MR. PENDERGRASS:  (Indiscernible.)

8          THE COURT:  Folks, I mean, I really think

9     I've heard about as much as I need to hear.

10    Miss Marangola, I'll listen to you.  But this is

11    all about -- it's not even about -- as I look back

12    on the affidavit it's not about the house at all,

13    it's about the car.

14          MS. MARANGOLA:  It's not, I know.  But you

15    allowed the defendant to go on and on about the

16    house --

17          THE COURT:  I understand.

18          MS. MARANGOLA:  -- uninterrupted.  And now

19    it's my turn to cross.

20          THE COURT:  I understand.  I understand.

21    Well, let me just say this.  I'm going to give you

22    leeway, but we're not going to take all afternoon,

23    and focus on the car, that's what it's all about.

24    So have at it.  Objection overruled.

25    BY MS. MARANGOLA:

1    Q.  You indicated that you gave keys to the garage

2    to the contractor in this case.  What's his name?

3    A.  I don't know his name.  I just know his first

4    name, Eric.  Frontier is the name of the

5    contractor.  I didn't find the contractor.  I

6    didn't hire the contractor.

7    Q.  So you want this Court to believe that you

8    handed keys to your home to your garage to the area

9    that you house your expensive vehicle in to a

10   person you don't know their name?

11           MR. PENDERGRASS:  Objection to the

12   characterization of his home, your Honor.

13           THE COURT:  Overruled.

14           THE WITNESS:  Ma'am, there was nothing in

15   the house.

16   BY MS. MARANGOLA:

17   Q.  Yes or no, you gave the keys to an individual

18   who you didn't even know by name?

19   A.  I knew his first name.  I knew he was a

20   licensed contractor.

21   Q.  You didn't hire him?

22   A.  No.

23   Q.  So you heard from somebody else that this man

24   Eric is a person that you should give keys to?

25   A.  He was hired to do the work, so I did what I

1    was told, I gave him the keys.

2    Q.   And you trusted this man, whose name you don't

3    know, to be in close proximity to your unlocked

4    vehicle?

5    A.   I gave him the keys, ma'am.

6    Q.   Now, you told this Court that you only go to

7    that location to monitor the contractors and allow

8    them into the building, isn't that correct?

9    A.   No, I didn't say that.

10   Q.   What are your reasons for going to that house?

11   A.   I said I went there to check on the work that

12   was being done from time to time.

13   Q.   And that was your only reason for going there?

14   A.   Yes, ma'am.

15   Q.   Now, you would agree that you and your fiance

16   own three dogs together, isn't that true?

17   A.   No, ma'am.

18   Q.   You don't own three dogs?

19   A.   No, ma'am.

20   Q.   Isn't it true that your dog was shot during

21   this -- the search warrant?

22   A.   I wasn't at that location, ma'am, so I don't

23   know what happened.

24   Q.   Well, you've been speaking to Paula Cruz while

25   you're incarcerated, isn't that correct?

1    A.   Yes, ma'am.

2    Q.   You're aware that your calls are monitored and

3    recorded, isn't that correct?

4    A.   Yes, ma'am.

5    Q.   And once you were in custody, you had a

6    conversation with Paula about how upset you were

7    that your dog was killed at that location.

8    A.   There was no dog killed, ma'am.

9    Q.   You heard the testimony of Deputy Granville

10   here in court today.

11   A.   There was no dog killed, ma'am.  They shot a

12   dog in the ear.

13   Q.   Was that your dog?

14   A.   I take care of the dogs.  The dogs weren't

15   mine.  But they end up being -- I'm in receipt --

16   assume responsibility of them.

17   Q.   And you assumed responsibility for those dogs

18   for some time, isn't that correct?

19   A.   Yes.

20   Q.   And you housed them at 93 Elmer Street?

21   A.   No, ma'am.

22   Q.   They just happened to be there on November

23   16th, 2011?

24   A.   No.  They originally got there because someone

25   needed a place to keep dogs.

1    Q.  And when did they get there?

2    A.  I can't tell you the exact date.

3    Q.  It was well in advance of November 16th, 2011,

4    would you agree?

5    A.  Correct, ma'am.

6    Q.  In fact, they were at that location for several

7    months leading up to the date you were arrested?

8    A.  Correct, ma'am.

9    Q.  And you took care of those dogs, as you just

10   stated, as a favor to somebody?

11   A.  Yes, ma'am.

12   Q.  So you would agree that dogs need to be fed

13   daily, correct?

14   A.  Yes, ma'am.

15   Q.  And they need to be taken out to use -- you

16   know, to go to the bathroom?

17   A.  The dogs are kept in kennels, ma'am.

18   Q.  You would agree they need to be fed every day?

19   A.  Yes, ma'am.

20   Q.  And that would require you, as their caregiver,

21   to feed them everyday at that location, isn't that

22   correct?

23   A.  It's correct, ma'am, but I wasn't the one doing

24   that.

25   Q.  It's your testimony that you delegated that

1    duty to somebody else?

2    A.   There is a gentleman named Dennis Brown that

3    take cares of the dogs, ma'am.

4    Q.   Where does Dennis Brown live?

5    A.   In Buffalo.

6    Q.   The address?

7    A.   I don't know his address presently.

8            MR. PENDERGRASS:  Objection.  Relevance to

9    this hearing.

10            THE COURT:  What's the relevance?

11            MS. MARANGOLA:  He's saying this

12    individual is watching his dogs, and I'm trying to

13    get information to corroborate his story.

14            THE WITNESS:  He takes care of dogs.

15            THE COURT:  I'll tell you what, folks, I

16    really think I've heard everything I need to hear

17    right now.  I'll listen to you briefly.  Bearing in

18    mind that we're talking about the car, we're

19    talking about the fact that there is a presumption

20    in this case, here's what I'm going to do.

21       Sir, you may step down, and I'll hear --

22            MS. MARANGOLA:  Is my cross limited at

23    this point?

24            THE COURT:  I'm going to tell you what I'm

25    going to do, Ms. Marangola, then you can object or

1    not object as you see fit.

2        All right.  I asked for testimony because

3    during the proffer there had been some questions

4    raised as to the defendant's ties to this vehicle

5    and ties to the property, and that's been explored

6    by the testimony that we've heard today.  I think

7    the -- there is some question with respect to the

8    property as to how many people had access to it,

9    but for purposes of the complaint, nothing that

10   underlies the complaint was taken from the property

11   at 93 Elmer.  Everything was taken from the Hummer.

12       The testimony is that it was parked there since

13   August, but it is his car.  It's an expensive

14   vehicle.  He said he didn't know whether or not he

15   locked it.  I find that to be -- applying common

16   sense, if it's a -- if it's an expensive vehicle, I

17   think a reasonable assumption and inference would

18   be that it was locked.  Mr. Howard said that his

19   co-defendant had a set of keys to it.  First of

20   all, there is no co-defendant in this case.  Maybe

21   a co-defendant in a state case.

22       But, given the fact that there is a presumption

23   in this case, I think the testimony that I've heard

24   gives enough credence and support to the evidence

25   that would tie the defendant to the firearms and

1    the cocaine that were taken from the -- from the

2    vehicle that I don't think -- I think the evidence

3    is -- is compelling.  I don't think the presumption

4    has been overcome, and I'm going to order the

5    defendant detained.

6         He reserves the right to request

7    reconsideration in the future based on changed

8    circumstances.  He is entitled to the presumption

9    of innocence for trial, and nothing that I say

10   should be interpreted as interfering with that

11   presumption, but that's a presumption for trial.

12        I'm obligated under the Bail Reform Act to

13   consider a number of factors, including the

14   strength of the evidence, and I find that the

15   strength of the evidence against him is

16   considerable for purposes of this proceeding.

17   Anything further?

18             MR. PENDERGRASS:  Your Honor, if I just --

19   if I could just be heard?

20             THE COURT:  You may.

21             MR. PENDERGRASS:  Your Honor, clearly the

22   evidence establishes that -- that my client is the

23   owner of the vehicle, but I think what else the

24   evidence establishes is that my -- that are there

25   are --

1          THE COURT:  Why don't you sit down, and

2     then you're picked up better on the mike, either

3     there or at the podium, Mr. --

4          MR. PENDERGRASS:  But I think what else

5     the evidence establishes that there were other

6     individuals who had access to the garage and to the

7     vehicle.  You know, certainly it's a 2008 expensive

8     vehicle.  But as the testimony established, there

9     was at least one other person -- and when my client

10    says a co-defendant, your Honor, just so that this

11    Court understands, that the night he was arrested

12    on November 16th, 2011, he was arrested with

13    another individual.

14         THE COURT:  That's why I said I assume he

15    was referring to a co-defendant in state court.

16         MR. PENDERGRASS:  Yes.

17         THE COURT:  Right.

18         MR. PENDERGRASS:  Yes.  And consequently,

19    that matter, if you will, was -- or, in fact,

20    Mr. Myron was not a case book co-defendant, because

21    what they chose to do was to charge Mr. -- they

22    chose to charge Mr. Johnson with the -- with the

23    results of their search at 43 Ruspin and to charge

24    Mr. Howard separately with the results of the

25    search at 93 Elmer.

1    With that said, Mr. Johnson did have a key to

2    the vehicle.  That evidence is uncontroverted.  The

3    other evidence that's uncontroverted is that

4    there's an individual that -- a person who's

5    working at the property that had access to the

6    garage, had a key, not only to get into the

7    property, but had a key to the garage as well, your

8    Honor.

9         THE COURT:  But there was no testimony

10   that he had a key for the vehicle.

11        MR. PENDERGRASS:  No, sir.  Certainly no

12   testimony that he had a key for the vehicle.

13   Certainly there's testimony that at least one other

14   individual had a key to the vehicle.  But I would

15   point -- because the Court asked me to provide a

16   copy of the felony hearing, which I meant to hand

17   up to the Court prior to the proceeding.

18        In that -- in the felony hearing, the

19   detectives who initially went into the vehicle

20   weren't sure whether the vehicle was locked or

21   unlocked at the time.  And, quite frankly, I think

22   the Court can conclude from the fact that my client

23   put it behind a locked gate, I think that the Court

24   can make an innocuous -- or could conclude

25   innocuously that because it was behind the locked

1    gate, that, you know, there was no need to put the

2    lock on on the car.

3        I think given -- given the fact that there were

4    multiple people having access in that no one here

5    has testified that my client had -- had access to

6    the garage.  No one here has testified that my

7    client went into the garage, went into that house

8    during the time of their investigation.  The only

9    one that's testified here regarding that is my

10   client, and he testified I think quite honestly

11   that he went in to oversee at certain times the

12   progress of the work being done at the home.

13       So I think, you know, consequently given --

14   given what the testimony is, your Honor, that some

15   sort of bail would be appropriate in this matter.

16           MS. MARANGOLA:  With respect the Court's

17   ruling, I believe the Court ruled that the

18   defendant would be detained, as the presumption

19   wasn't overcome.  I stated the reasons.  And to

20   (indiscernible).  I'll save you from that, but --

21           THE COURT:  And again just so you

22   understand -- I know you do understand,

23   Mr. Pendergrass, and for Mr. Howard's benefit, it

24   is my role, and I'm not purporting to determine

25   ultimately his guilt or innocence.  That will be

1    for trial.  All I'm doing right now is weighing the

2    evidence that I've heard in the context of there

3    being a presumption in this case by virtue of the

4    nature of the charges against him that there is no

5    condition or combination of conditions which would

6    reasonably assure that if released he would not

7    pose a risk of flight or danger to the community.

8    And what I have said is that I think it's extremely

9    unlikely, in the context of what I've heard and in

10   the context of that presumption, that he had

11   nothing to do with what was found in the vehicle.

12   And that's all I'm saying.

13       I think the evidence certainly is substantial

14   which could lead to the conclusion that he did have

15   some tie to what was found in the vehicle, either

16   by himself or in conjunction with the individual

17   who he's referred to as his co-defendant.

18       I also note, and I didn't mention previously, I

19   had meant to, and I'll allow you to address this if

20   you wish, Mr. Pendergrass.  But earlier today

21   before we took testimony, Miss Marangola made

22   reference to the fact that apparently there's a

23   jailhouse -- a recording of a jailhouse

24   conversation in which Mr. Howard wanted another

25   individual to submit an affidavit and take the fall

1    for him.  Again, whether that's true or not, I

2    don't know.  But it's been proffered by the

3    government, and it's another factor I'm

4    considering.

5        So, with having said all that, that is my

6    ruling, and I'll get a written order out.  Now --

7    what?

8              MS. MARANGOLA:  I plan on indicting this

9    case imminently, so perhaps the next date should be

10   a 48(b) date or a status date, whatever the

11   Court --

12             THE COURT:  Linda, did we?  I don't think

13   we did.  I think we just deferred until today's

14   proceedings.  So why don't we set a 48(b) date.

15   What do counsel suggest?

16             MS. MARANGOLA:  Thirty days would be fine

17   or 45 days.  In the meantime it will be indicted,

18   so the date --

19             THE CLERK:  No, one was not set, Judge.

20             THE COURT:  Pardon?

21             THE CLERK:  No Rule 48 date was set.

22             THE COURT:  Mr. Pendergrass, is 30 days

23   all right for a 48(b) date?

24             MR. PENDERGRASS:  Yes, your Honor.

25             THE COURT:  Okay.  Then today is

84

1    February 15th, so we'll say that pursuant to

2    Rule 48(b) of the Federal Rules of Criminal

3    Procedure, the complaint will be automatically

4    dismissed as of 12:01 a.m. on Thursday,

5    March 15th, 2012.  If counsel advise me prior to

6    that date that they've reached a plea agreement and

7    need additional time to schedule plea proceedings,

8    I will extend the deadline, otherwise the dismissal

9    will be automatic, and counsel should proceed

10   accordingly.

11        Miss Marangola, do you wish to be heard as to

12   the Speedy Trial Act between today and March 15th?

13            MS. MARANGOLA:  Yes, your Honor.  I'd ask

14   that the time be excluded pursuant to Title 18 of

15   the United States Code, Section 3161(h)(7)(A).

16   It's the government's position that the ends of

17   justice served by the continuance outweigh the

18   defendant's and the public's interest to a speedy

19   trial.  Between now and March 15th the government

20   will have ongoing discussions with defense counsel

21   about a potential resolution.  I will begin

22   accumulating the discovery in this case and

23   providing it to defense counsel, which would

24   benefit him in preparing an adequate defense for

25   his client.

1          Given that, your Honor, I do believe that it is

2     in the interest of justice to exclude the time

3     between now and March 15th.

4               THE COURT:  You agree to the exclusion?

5               MR. PENDERGRASS:  I don't, your Honor.

6               THE COURT:  You don't agree to the

7     exclusion?

8               MR. PENDERGRASS:  I don't agree to the

9     exclusion.  My client is now being detained in this

10    matter on this criminal complaint.

11              THE COURT:  Let me just interrupt, because

12    as I think about this, I suppose we don't need to

13    exclude time.  Time has been excluded until today,

14    then under the Bail Reform Act there's

15    automatically 30 days until -- so we don't need to

16    exclude time.  So you don't have to agree or

17    disagree.  The dismissal date will be --

18              MS. MARANGOLA:  The same.

19              THE COURT:  Pardon?

20              MS. MARANGOLA:  It's the same date, 30

21    days.

22              THE COURT:  Yes.  So, the dismissal date

23    will be March 15th at 12:01 a.m.

24              MS. MARANGOLA:  Thank you, your Honor.

25              MR. PENDERGRASS:  Thank you, your Honor.

86

1                    THE COURT:  Thank you.  Do you want him

2         returned to state custody?

3                    MR. PENDERGRASS:  Yes, your Honor.

4                    THE COURT:  Okay.  So he will be returned

5         to state custody.  Thank you.

6                    MR. PENDERGRASS:  Can I just have a couple

7         of minutes?

8                    THE COURT:  Yes.

9                    *      *      *      *      *      *

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                           CERTIFICATION

2

3          I certify that the foregoing is a

4      correct transcription, to the best of my

5      ability, from the electronic sound recording

6      of the proceedings in this matter.

7

8

9                         s/Michelle L. McLaughlin
                          Michelle L. McLaughlin, RPR
10                             Official Reporter
                             U.S.D.C., W.D.N.Y.
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25